UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JANICE HIRST,

    Plaintiff,

v.                                        Case No. 21-CV-992

KILOLO KIJAKAZI,
Acting Commissioner of Social Security[1],

    Defendant.

## DECISION AND ORDER

Janice Hirst seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying her claim for a period of disability and disability insurance benefits under the Social Security Act, 42 U.S.C. § 405(g). For the reasons explained below, the Commissioner's decision is affirmed and the case is dismissed.

## BACKGROUND

On January 24, 2019, Hirst filed an application for a period of disability and disability insurance benefits, alleging disability beginning on January 19, 2018 (Tr. 97) due to back osteoarthritis, meniscus tears, ulnar neuropathy, fatigue, and depression (Tr. 206). Hirst's application was denied initially and upon reconsideration. (Tr. 97.) Hirst filed a request for a hearing, and a hearing was held before an Administrative Law Judge ("ALJ") on December 4, 2020. (Tr. 15–59.) Hirst testified at the hearing, as did Emily M. Veith, a vocational expert. (Tr. 16.)

---

[1] The court has changed the caption to reflect Kilolo Kijakazi's appointment as acting commissioner.

In a written decision issued January 4, 2021, the ALJ found that Hirst had the severe impairments of degenerative joint disease of the bilateral knees and osteoarthritis. (Tr. 100.) But the ALJ also found that Hirst did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "Listings"). (Tr. 104.) Further, the ALJ found that Hirst had the residual functional capacity ("RFC") to perform light work, with the following limitations: can perform work involving no more than frequent climbing of ramps and stairs and frequent balancing and stooping; occasional climbing of ladders, ropes, or scaffolds, and occasional kneeling, crouching, and crawling; frequent use of the bilateral hands for handling; frequent operation of foot controls with the bilateral lower extremities; and must avoid even moderate exposure to unprotected heights, hazards, and the use of dangerous moving machinery. (Tr. 105.)

The ALJ ultimately found that Hirst was capable of performing her past relevant work as a shipping order clerk. (Tr. 110–11.) As such, the ALJ found that Hirst was not disabled from January 19, 2018 through the date of the decision. (Tr. 111.) The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Hirst's request for review. (Tr. 6–11.)

## DISCUSSION

### 1. *Applicable Legal Standards*

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is not conclusive evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (internal quotation and citation

omitted). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. Essentially, the ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

### 2. *Application to This Case*

Hirst advances three arguments for remand: (1) the ALJ failed to properly evaluate the opinion of her treating provider, Dr. Bozena Biernat; (2) the ALJ erroneously found that her mental impairments were not severe; and (3) the ALJ derived his power from an unconstitutionally appointed Commissioner and thus lacked the authority to act on her claim. (Pl.'s Br., Docket # 14.) I will address each argument in turn.

#### 2.1 Evaluation of Treating Provider's Opinion

Hirst argues that the ALJ erred in evaluating the opinion of her treating physician, internist Dr. Bozena Biernat. An ALJ must consider all medical opinions in the record regardless of their source; however, the ALJ will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinions, including those from the

claimant's medical sources. 20 C.F.R. § 404.1520c(a). The ALJ must consider an opinion's persuasiveness based on a number of factors, including supportability, consistency, examining relationship, the provider's specialization, and other relevant factors. *Id.* § 404.1520c(c).

On December 16, 2019, Dr. Biernat completed a Physical Medical Source Statement, opining that Hirst had the diagnoses of osteoarthritis and stage IV chondromalacia and clinical findings of severe osteoarthritic changes in multiple joints. (Tr. 459.) Dr. Biernat opined that Hirst could only sit or stand for fifteen minutes at one time, could sit, stand, or walk for less than two hours total in an eight-hour workday, and would need to take unscheduled breaks every week for one to two days before returning to work. (Tr. 460.) Dr. Biernat further opined that Hirst's legs should be elevated with prolonged sitting, that Hirst must use a cane or other hand-held assistive device while engaging in occasional standing or walking, and that she can never lift and carry more than ten pounds. (Tr. 461.) Finally, Dr. Biernat opined that Hirst would be off task 25% or more in a typical workday and would miss more than four days of work per month due to her impairments or treatment. (Tr. 462.)

The ALJ found Dr. Biernat's opinion unpersuasive, explaining that a review of Hirst's treatment records did not support the level of limitation opined by Dr. Biernat. (Tr. 107.) Specifically, the ALJ noted that there was no evidence that Hirst's use of a cane was medically required; that aside from some reduced range of motion and tremor of the bilateral wrists and knees at a consultative examination, other musculoskeletal range of motion findings were normal; that Hirst exhibited normal bilateral muscle strength, apart from some weakness of the left hip, and normal bilateral stability of the patellofemoral; and that Hirst was neurologically intact with normal motor activity and no sensory deficits. (*Id.*) As such, the

ALJ concluded that precluding Hirst from any work activity as suggested by Dr. Biernat was disproportionate to the objective examination findings. (*Id.*)

The crux of Hirst's first claim of error is that the ALJ failed to consider her osteoarthritis and grade IV chondromalacia of the knees in discounting Dr. Biernat's opinion. (Pl.'s Br. at 8–10.) Chondromalacia is defined as the "softening of any cartilage," *Stedman's Medical Dictionary*, and grade IV is the "most severe grade," indicating "exposure of the bone with a significant portion of cartilage deteriorated. Bone exposure means bone-to-bone rubbing is likely occurring in the knee." https://www.healthline.com/health/chondromalacia-patella#diagnosis (last visited Aug. 30, 2022). Hirst contends that Dr. Biernat's opinions regarding her physical limitations were defined by the diagnosis of grade IV chondromalacia, and the ALJ's failure to mention the condition when rejecting Dr. Biernat's opinion constitutes reversible error. (Pl.'s Br. at 7–9, 12.)

Hirst has a history of degenerative joint disease of both knees and previously underwent surgical repair of the right knee in 2013 and the left knee in 2003. (Tr. 105.) Hirst's knee symptoms reoccurred in September 2018 after injuring both knees. (Tr. 366.) On October 26, 2018, an MRI of the right knee noted "moderate to severe chondromalacia in the medial compartment with subchondral edema." (Tr. 346.) Hirst underwent an additional right knee surgery in November 2018. (Tr. 348.) Several weeks post-surgery, Hirst reported that she was doing well and that her right knee was not giving her any significant difficulty other than some mild aching. (Tr. 354.) Her treating orthopedist, Dr. James Grace, set up an MRI of the left knee, looking for meniscus tearing. (*Id.*) An MRI of the left knee taken on December 5, 2018

showed an extensive medial meniscal tear and moderate-severe osteoarthritis and medial joint space. (Tr. 357.)

A record from orthopedist Dr. Walker Flannery from February 13, 2019 noted that Hirst had grade IV chondromalacia in both knees (Tr. 367), and he administered injections to the bilateral knees (Tr. 369). Hirst considered surgery on the left knee; however, Dr. Flannery advised her that the results of surgery would be unpredictable given her osteoarthritis. (Tr. 367.)

Hirst underwent a consultative examination with Dr. Jennifer Sabatier on August 24, 2019. (Tr. 408.) Dr. Sabatier noted that Hirst ambulates with difficulty and uses an assistive device, but in her opinion, the assistive device was helpful but not medically required. (Tr. 410.) Dr. Sabatier opined that Hirst could walk one mile given her knee pain, could stand occasionally in an eight-hour workday, and could walk frequently in an eight-hour workday. (Tr. 412.)

Hirst established care with Dr. Biernat on November 1, 2019. (Tr. 422.) Hirst noted several concerns, including severe stress, depression, anxiety, osteoarthritis, ulnar neuropathy, fatigue, and elevated cholesterol levels. (*Id.*) Upon physical examination, Dr. Biernat noted normal strength, sensation, and reflexes throughout her body and normal extremities. (Tr. 424.) An additional MRI of the right knee taken on November 18, 2019 demonstrated mild chondromalacia in the medial compartment and a small joint effusion. (Tr. 438.) On November 29, 2019, Hirst again consulted with Dr. Biernat, who noted that Hirst's depression had improved since starting sertraline. (Tr. 466.) Upon physical examination, Dr. Biernat noted, "musculoskeletal-arthritic changes seen both lower extremities." (Tr. 466.) On December 3, 2019, Hirst consulted with Dr. Thomas Sullivan

regarding her right knee and right hip. (Tr. 446.) Dr. Sullivan administered an injection in her right knee. (*Id.*)

Hirst again visited Dr. Biernat on June 4, 2020. (Tr. 489.) While Dr. Biernat noted the results of the November 2018 MRI and the cortisone injection administered in December, Hirst stated that there were "no other concerns to discuss," and Dr. Biernat advised her to continue to follow up with her orthopedic surgeon. (Tr. 491.) On August 26, 2020, Hirst consulted with Dr. Patrick McKenzie regarding her bilateral knee pain. (Tr. 500.) Hirst reported that she was wearing a knee sleeve, which was somewhat helpful, but felt her symptoms had been gradually worsening. (*Id.*) Upon physical examination, Dr. McKenzie noted some tenderness to palpation of the right and left knees, but normal range of motion.[2] (Tr. 501–02.)

Hirst underwent MRIs of both knees on August 28, 2020. The left knee showed a residual prominent horizontal signal and irregularity about the posterior horn extending into the body of the medial meniscus; a large area of grade 3-4 chondrosis about the weightbearing extension zone of the medial femoral condyle; chondral fissuring about the central trochlea; and small joint effusion with changes of synovitis. (Tr. 512.) The right knee showed a horizontal cleavage tear involving the posterior horn of the medial meniscus extending to the junction with the body with degenerative tear involving the junction of the body and anterior

---

[2] Hirst's range of motion of the right knee was 0 degrees of extension and 120 degrees of flexion while her left knee measured to 0 degrees of extension and 140 degrees of flexion. (Tr. 502.) Normal range of motion at the knee is considered to be 0 degrees of extension (completely straight knee joint) to 135 degrees of flexion (fully bent knee joint). https://www.livestrong.com/article/40176-normal-range-motion-knee/(last visited Aug. 30, 2022). *See also* https://www.verywellhealth.com/what-is-normal-range-of-motion-in-a-joint-3120361 (last visited Aug. 30, 2022) (stating normal range of motion of the knee on flexion is 0 to 150 degrees and on extension 120 to 0 degrees).

horn; osteoarthritis of the medial compartment; and small suprapatellar joint effusion. (Tr. 514.)

Hirst consulted with nurse practitioner Amy Zabel on September 8, 2020. (Tr. 507.) Zabel noted that Hirst's knee demonstrated effusion, she had pain and clicking with deep flexion and rotation, and demonstrated a positive McMurray's test, as well as tenderness to palpation of the medial joint line. (*Id.*) Hirst elected to undergo cortisone injections in both knees. (*Id.*) On September 29, 2020, Hirst sent a message to Zabel following up on the September 8 injections. (Tr. 499.) She wrote: "Not 100% pain free but definitely RELIEF that Tylenol could never give me." (*Id.*) She continued: "What an improvement & a huge reduction of inflammation. . . . My knees are slightly stiff upon walking. My right knee catches more often and both knees crack . . . at lease [sic] once a day now. Still ache after standing/walking too long and get achy after sitting with knees/legs at a 90 degree angle after about 30 minutes." (Tr. 499–500.) Hirst went on to thank Dr. McKenzie and his team "for proving [sic] me the pain relief I was looking for. I know I will always have some pain with all that's an issue with both knees." (Tr. 500.)

It is clear Hirst's focus in alleging disability is on her knee issues. (Tr. 23.) At the administrative hearing, Hirst's counsel stated that "the osteoarthritis of the knees is kind of everything." (*Id.*) Hirst argues the ALJ erred in assessing the supportability and consistency of Dr. Biernat's opinion because the ALJ essentially ignored her knee issues, thus undermining his analysis of Dr. Biernat's opinion, which focuses on the stage IV chondromalacia and the osteoarthritis diagnoses. (*See* Pl.'s Br. at 11–12 (arguing that the ALJ failed to assess Dr. Biernat's opinion by failing to address the underlying conditions supporting it).)

Hirst's contention is simply inaccurate. As stated above, a medical opinion's persuasiveness is analyzed based on factors such as supportability and consistency with the record as a whole. 20 C.F.R. § 404.1520c(c). Supportability addresses the extent to which a medical opinion is explained by the provider and supported by objective findings. *See* 20 C.F.R. § 404.1520c(c)(1). The ALJ specifically found Hirst's degenerative joint disease of the bilateral knees and osteoarthritis to be severe impairments (Tr. 100), and despite not specifically mentioning the stage IV chondromalacia, the opinion makes a detailed analysis of her knee impairments. Furthermore, the ALJ does not ignore Hirst's physical examination findings and imaging showing severe arthritis. The ALJ cites Hirst's continued complaints of persistent bilateral knee pain, swelling, and instability after the 2018 right knee surgery. (Tr. 106.) He cites the December 2018 MRI showing a meniscal tear (Tr. 106, citing Tr. 357) and the August 2020 MRI showing a "significant degree of osteoarthritis" (Tr. 106, citing Tr. 521). The ALJ further cites Hirst's right knee MRIs from November 2019 and August 2020 showing a degenerative tear and osteoarthritis. (Tr. 106, citing Tr. 438, 513.) Thus, the ALJ clearly considered the medical evidence, including imaging and Hirst's statements to her providers, supporting the severity of her osteoarthritis.

But an ALJ also considers an opinion's consistency in evaluating its persuasiveness. The consistency of a medical opinion addresses the extent to which the opinion is consistent with the record evidence as a whole, including evidence from other medical and nonmedical sources. *See* 20 C.F.R. § 404.1520c(c)(2). Hirst argues the ALJ erred by failing to address her abnormal physical examination findings and the findings consistent with Dr. Sabatier's examination. (Pl.'s Br. at 12–13.) She further argues that the ALJ erred in his assessment by

9

improperly rejecting Dr. Biernat's opinion regarding her knees through citation to evidence regarding her wrists, hips, and musculoskeletal range of motion. (*Id.* at 8.)

Hirst's arguments are unavailing. Again, Hirst argues that the ALJ improperly rejected Dr. Biernat's opinion regarding her knees through citation to evidence regarding her wrists, hips, and musculoskeletal range of motion. (*Id.*) But that is not what the ALJ did. The ALJ cites the physical examination conducted by Dr. Sabatier which demonstrates normal range of motion of the knees on both flexion and extension.[3] (Tr. 412.) While the ALJ does cite abnormal examination findings regarding her wrists and hips, among others, he does not do so to discount the knee findings. Rather, the ALJ makes the point that *except for* some abnormal findings (i.e., reduced range of motion of the wrists, etc.), the remainder of her physical examination was normal. (Tr. 107.) In other words, the ALJ is analyzing both Hirst's normal and abnormal physical findings, as he should.

Hirst's argument that the ALJ failed to properly consider the consistency of Dr. Biernet's and Dr. Sabatier's opinions is not entirely clear. She seems to argue that both doctors found use of a cane medically necessary, severe osteoarthritic changes in multiple joints, and less than a full range of motion in several joints, and the ALJ erred by failing to consider how Dr. Sabatier's opinion supports Dr. Biernet's. (*See* Pl.'s Br. at 13.) But again, the ALJ does not ignore the medical evidence showing osteoarthritis and abnormal physical findings. Furthermore, the doctors' opined restrictions are significantly different. The doctors *do not* agree on whether use of a cane is medically necessary. And Dr. Sabatier opined, for example, that Hirst could walk a mile and could walk frequently in an eight-hour workday (Tr. 412), whereas Dr. Biernat opined Hirst could walk less than half a block without rest and less than

---

[3] Dr. Sabatier measured Hirst's knee flexion as 150 degrees on the right and 140 degrees on the left and extension at 0 degrees with both knees. (Tr. 412.)

10

two hours total in an eight-hour workday (Tr. 460). And while the ALJ rejected Dr. Biernat's opinion, he found Dr. Sabatier's opinion partially persuasive. (Tr. 107.) Thus, it is unclear just how Hirst believes Dr. Sabatier's opinion and/or findings bolster the persuasiveness of Dr. Biernat's opinion.

Finally, Hirst generally argues that the ALJ cherry picks the record, citing evidence supporting his conclusion and ignoring evidence supporting a finding of disability. (Pl.'s Br. at 12.) I disagree. Again, the ALJ cited Hirst's subjective symptoms of persistent bilateral knee pain, imaging showing osteoarthritis and tears, and other medical records indicating abnormalities upon physical examination. But the ALJ also cited the fact Hirst continued to undergo conservative, non-operative measures and found some relief with knee sleeves and injections. (Tr. 106.) He articulated how Dr. Biernat's opinion was not supported by examination findings, including her normal range of motion and muscle strength, intact neurological findings, and patellofemoral stability. (Tr. 107.)

Thus, I find the ALJ properly evaluated Dr. Biernat's medical opinion and articulated his rationale consistent with the regulations. Remand is not warranted on this basis.

### 2.2 Evaluation of Mental Impairments

Hirst next argues that the ALJ erred in finding that her mental impairments were not severe. (Pl.'s Br. at 14.) At step two of the five-step sequential evaluation, the ALJ determines whether a claimant has one or more medically determinable physical or mental impairments. 20 C.F.R. § 404.1521. An impairment must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques; thus, a physical or mental impairment must be established by objective medical evidence from an acceptable medical source. *Id.* A plaintiff's statement

of symptoms, a diagnosis, or a medical opinion alone will not establish the existence of an impairment. *Id.*

After a medically determinable impairment is established, the ALJ then determines whether the impairment is severe. 20 C.F.R. § 404.1521. The regulations define a severe impairment as "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* § 404.1520(c). The ALJ's step two determination is "a *de minimis* screening for groundless claims." *Meuser v. Colvin*, 838 F.3d 905, 910 (7th Cir. 2016) (internal quotation and citation omitted). An impairment is "not severe" if it is "a slight abnormality" that has "no more than a minimal effect on the ability to do basic work activities." *Id.* (internal quotation and citation omitted).

The ALJ engaged in an extensive analysis of Hirst's alleged mental impairments at step two. First, the ALJ noted that while there was "a mental health aspect" to Hirst's case, the record showed no evidence of efforts of concerted treatment until Hirst began medication management in November 2019 and counseling in December 2019. (Tr. 100.) The ALJ found that treatment notes indicated Hirst's complaints of mood cycling and anxiety largely connected to situational stressors, but medication helped to bring the symptoms under reasonable control with few side effects. (*Id.*)

Given this relatively recent evidence, the ALJ noted, Hirst was referred for a psychological examination with Kelly Schinke, Psy.D. in order to clarify the nature and severity of any existing mental impairment. (*Id.*) The ALJ noted Dr. Schinke's diagnosis of depression and potential limitations in Hirst's ability to maintain attention and concentration and to adapt/manage stress and changes, and found the opinion evidence somewhat persuasive. (Tr. 101.)

The ALJ also noted that based on reports of inattentive behavior and memory problems, Hirst was referred for a neuropsychological evaluation with David Leicht, Ph.D. in July 2020. (*Id.*) The ALJ noted that behavioral observations revealed grossly normal findings and that Dr. Leicht diagnosed Hirst with a social anxiety disorder, anxiety, and attention deficit hyperactivity disorder. (*Id.*)

Finally, the ALJ noted the assessments of the State Agency psychological consultants, Dr. Robert Barthwell and Dr. Jan Jacobson, who both found that Hirst's medically determinable mental impairments of depression, bipolar, and related disorders were non-severe. (Tr. 102.) The ALJ found these opinions consistent with objective medical evidence showing that Hirst received little mental health treatment and her psychological symptoms did not significantly interfere with her day-to-day functioning. (*Id.*) As such, the ALJ concluded that Hirst's medically determinable mental impairment of depression did not cause more than minimal limitation in her ability to perform basic mental work activities and thus was non-severe. (*Id.*)

Hirst's argument regarding the ALJ's analysis of her mental impairments is unconvincing. In her brief, she asserts that the ALJ concluded that her mental impairments were not severe "without assessing the consistency of Dr. Schinke's consultative examination and the opinion of Dr. Sabatier" because both noted that Hirst had depression. (Pl.'s Br. at 14.) In her reply brief, she adds that while the ALJ "was not required to find mental limitations, the ALJ was behooved to address evidence in the record supporting mental limitations." (Pl.'s Reply Br. at 13, Docket # 21.)

It is true that the ALJ must account for the effects of both severe and non-severe medically determinable impairments in the RFC. However, the ALJ thoroughly went through

13

the evidence related to Hirst's mental impairments and articulated why her mental impairments either caused no limitations or mild limitations. The evidence cited by Hirst is unavailing. The ALJ was not required to credit Hirst's subjective reports to her providers. And the ALJ cited and thoroughly explained why he was discrediting her reports of disabling symptoms, including her normal behavioral observations during examinations, the fact she assumed *more* responsibilities of daily living due to her partner's health issues, her mostly normal psychometric testing, and her minimal treatment for a durational period of less than a twelve months. (Tr. 101.) As such, the ALJ did not err in this regard.

### 2.3 Constitutional Challenge to Structure of the SSA

Finally, Hirst argues that former Commissioner of Social Security Andrew Saul held his office on a constitutionally illicit basis, and because the ALJ derived his power from the Commissioner, the ALJ lacked authority to act on her claim. (Pl.'s Br. at 21.) Hirst relies on *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2204 (2020), in which the Supreme Court held that the leadership of the Consumer Financial Protection Bureau by a single director who was removeable by the President only for inefficiency, neglect, or malfeasance was a violation of separation of powers. Hirst asserts that the similar structure of the SSA—specifically that the Commissioner is the singular head of the agency, serves for six years, and cannot be removed by the President except for cause under 42 U.S.C. § 902(a)(3)—is also unconstitutional. (Pl.'s Br. at 20.) She concludes that the Commissioner cannot grant legal authority when they hold that authority illegally, and thus the ALJ in this case lacked authority to decide her claim. (*Id.* at 22.)

Hirst acknowledges that this argument "has been rejected by multiple district courts" and provides more than a page's worth of string cites on this point. (*Id.* at 15–17.) Notably,

since deciding *Seila Law*, the Supreme Court has explained that even when an unconstitutional removal restriction exists, a plaintiff challenging the restriction is not automatically entitled to retrospective relief. *See Collins v. Yellen*, 141 S. Ct. 1761, 1788 n.3, 210 L. Ed. 2d 432 (2021) ("The unlawfulness of a removal provision does not strip an official of the power to undertake the other responsibilities of his office."). Instead, the unconstitutional removal restriction must inflict compensable harm. *Id.* at 1789. But Hirst argues that *Collins* is distinguishable and does not apply to her case. Specifically, she argues that *Collins* involved actions by acting directors not subject to the "for cause" removal provision at issue, while the Acting Commissioner of Social Security is subject to the same "for cause" provision as the Commissioner of Social Security. This is not distinctive. *Collins* is applicable regardless of whether the Acting Commissioner or Commissioner is involved.

Hirst further argues that even if *Collins* applies, under the third step of the analysis, multiple injuries exist, which amount to not receiving a constitutionally valid hearing, adjudication, and decision from the ALJ and the Appeals Councils. But, as the *Collins* court made clear, the unconstitutionality of a removal provision does not automatically void agency action. 141 S. Ct. at 1788 n.3. Because Hirst has not demonstrated a connection between § 902(a)(3) and the denial of her claim, I find that remand is not warranted on this basis.

## CONCLUSION

Hirst argues that the ALJ erred in adjudicating her disability benefits claim. I find the ALJ's decision was supported by substantial evidence. Thus, the Commissioner's decision is affirmed, and the case is dismissed.

15

Case 1:21-cv-00992-NJ   Filed 08/31/22   Page 15 of 16   Document 22

**ORDER**

**NOW, THEREFORE, IT IS ORDERED** that the Commissioner's decision is **AFFIRMED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 31st day of August, 2022.

BY THE COURT

NANCY JOSEPH
United States Magistrate Judge